UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DANIEL BURNS,

      Petitioner,

v.                                        Case No.  8:07-cv-1275-T-23AEP
                                                      **( Death Case )**

SECRETARY, Department of Corrections,

      Respondent.

_____/

## O R D E R

      Burns's petition for the writ of habeas corpus under 28 U.S.C. § 2254

challenges the validity of his death sentence for the 1987 slaying of a state trooper

during a traffic stop.  Burns asserts no challenge to the validity of the conviction.

The earlier order (Doc. 23) dismissed grounds IV and VII for procedural reasons.

Numerous exhibits ("Respondent's Exhibit __") support the response (Doc. 26) to the

merits.[1]  Burns replies (Doc. 29) and the respondent concludes with a rejoinder.

(Doc. 30)  This order denies Burns's request for habeas relief.

### I.  FACTS

      According to testimony at trial, the victim, Jeff Young, a Florida Highway
      Patrol Trooper, stopped an automobile with Michigan tags that was being
      driven north on Interstate 75 by Burns.  According to Burns' passenger,
      Samuel Williams, he and Burns were returning to Detroit from Fort Myers.
      Prior to making the trip, Williams overheard Burns say that he was going to

---

[1]  The exhibits are nicely organized as follows: (1) Exhibit A is the record for the original
proceeding, (2) Exhibit B is the record of the re-sentencing proceeding, (3) Exhibit C is the
unsuccessful certiorari review, (4) Exhibit D is the record of the first post-conviction proceeding, and
(5) Exhibit E is the record of the successive post-conviction proceeding.  Numerous volumes are
individually numbered within each exhibit.

make a couple of trips to Florida to purchase about $10,000 worth of cocaine. According to Williams, Trooper Young approached the car after pulling them over and asked Burns and Williams for identification.  He then returned to the patrol car to use the radio.  The highway patrol dispatcher testified that Trooper Young requested a registration check on the Michigan tag and a wanted persons' check.  Williams further testified that Young returned to the vehicle and asked to search it.  After searching the passenger compartment, Young asked to search the trunk, which Burns voluntarily opened.  According to Williams, Burns and Trooper Young began to struggle after the officer found what "looked like cocaine" in a bank bag that was in the trunk.

Several passersby who witnessed the struggle testified at the trial.  According to those witnesses, the struggle continued until the two ended up in a water-filled ditch.  At this point, Burns gained possession of Trooper Young's revolver.  Passersby who had returned to assist the officer testified that Young, who was attempting to rise out of the water, warned them to stay away and said, "He's got my gun."  Young told Burns, "You can go," and, "You don't have to do this."  According to testimony of these witnesses, Burns stood over Trooper Young, who had his hands raised, held the gun in both hands, and fired one shot.  According to the medical examiner, the shot struck the officer's wedding ring and grazed his finger before entering his head through his upper lip, killing him.  After telling Williams to leave with the vehicle, Burns fled the scene on foot.  By the time a fellow trooper arrived to assist Young, he was lying in the water-filled ditch, dead.  His shirt had been ripped exposing his bulletproof vest.

Burns was apprehended later the night of the murder.  A subsequent search of the vehicle, found abandoned the next day, revealed over 300 grams of cocaine in bags found under the spare tire in the trunk.  Burns's fingerprints were recovered from one of these bags.  Cocaine and documents with Burns's name on them were also found in the bank bag, which had been left on the ground at the scene of the murder.

Burns v. State, 609 So. 2d 600, 602-03 (Fla. 1992) ("Burns I").  Burns's death

sentence was vacated on direct appeal in Burns I.  A new penalty hearing produced

the same sentence, which was affirmed on appeal.  Burns v. State, 699 So. 2d 646

(Fla. 1997), cert. denied, 522 U.S. 1121 (1998) ("Burns II").  Each claim Burns

asserts in this federal petition challenges the validity of his death sentence from the

re-sentencing.

- 2 -

The jury in the re-sentencing proceeding unanimously recommended death.[2] (Respondent's Exhibit B-2 at 220)  The trial judge found three aggravating factors[3] and afforded some weight to both two statutory mitigating factors[4] and three non-statutory mitigating factors.[5]  (Respondent's Exhibit B-2 at 272-73)  The trial judge summarized the facts of the murder as follows (Respondent's Exhibit B-2 at 271-72):

> [After finding what "looked like cocaine"], Young turned to walk back to his patrol car with Burns walking behind him.  Burns suddenly, and without provocation from Young, lunged at Young, grabbed the trooper from behind and wrestled so violently with Young that both men fell to the ground behind Young's patrol car.  Burns, a much larger man than Young, covered the trooper so that it was not readily apparent that Young was under Burns.

---

[2]  In the first trial, the jury recommended death by a vote of 10-2.  Respondent's Exhibit A-15 at 2577.

[3]  The aggravating factors are "(1) the victim was engaged in the performance of his official duties as a highway patrol trooper when murdered by Burns; (2) the murder was committed to avoid arrest or to effect an escape from the victim's custody for the crime of cocaine trafficking; and (3) the murder was committed to disrupt the lawful exercise of any governmental function by or the enforcement of laws by the victim relating to cocaine trafficking." Burns II, 699 So. 2d at 648.  The three aggravating factors were merged and considered as one factor "because they were based on a single aspect of the offense:  the victim was a law enforcement officer." Burns II, 699 So. 2d at 648 n.3.

[4]  The statutory mitigating factors are "(1) Burns was forty-two years old when he committed the murder; and (2) Burns had no significant history of prior criminal activity." Burns II, 699 So. 2d at 648.  The judge considered age a mitigating factor because "it demonstrates, in conjunction with Burns' lack of a history of prior criminal activity, the length of time Burns obeyed the law prior to committing this crime." Burns II , 699 So. 2d at 648 n.4.

[5]  The non-statutory mitigating factors are "(1) Burns was one of seventeen children raised in a poor rural environment and consequently had few economic, educational, or social advantages, but despite these disadvantages, he is intelligent and became continuously employed after high school; (2) Burns contributed to his community and society, he graduated from high school, worked hard to support his family, with whom he had a loving relationship, and was honorably discharged from the military, albeit for excessive demerits after one month and seventeen days of active duty; and (3) Burns has shown some remorse, has a good prison record, behaved appropriately in court, and has demonstrated some spiritual growth." Burns II, 699 So. 2d at 648.

- 3 -

Young struggled to get away from Burns, but Burns grabbed Young in a bear hug from the rear pinning the trooper's arms against his body. Burns then lifted Young off the ground, shaking Young hard and throwing him around "like a sack of potatoes." As Burns threw Young around the two men went down an incline into a ditch where the men fell, Young coming to rest on his back. Burns first choked then flailed away at Young's face with closed fists, upward of ten blows. Burns grabbed Young's gun belt and ripped it free of the keepers that held the gun belt to Young's regular belt underneath, pulled the holster to the front, and removed Young's .357 revolver. Young wore a bullet-proof vest visible at the top of his shirt.

While Burns stood above Young, and while Young tried to stand up rising to a kneeling position, with palms pointed toward Burns as if pleading, Burns turned briefly back toward the roadway where several witnesses stood. Young told the witnesses to stay back because Burns had his (Young's) revolver and told Burns, "You don't have to do this."

Burns turned back toward Young, placed his left hand under his right hand that held the revolver, and at a range of 18 inches fired at Young's head. The bullet hit the ring finger of Young's left hand and went into Young's face just above his mouth. Turning to the witnesses, Burns looked, told [his passenger] to drive away, and then Burns calmly climbed over a fence and walked casually into a marshy area. Approximately three hours later Burns was caught in the marsh. Young's revolver was recovered later in the water at the spot where Burns was taken into custody.

The trial judge found that the aggravating factors outweigh the mitigating factors and imposed a sentence of death for the following reasons (Respondent's Exhibit B-2 at 273-74):

Young never provoked Burns, but Burns was the aggressor from start to finish.

Burns knew he was being followed by Young and that discovery of the crack cocaine would mean certain arrest, a drug trafficking conviction, and a lengthy prison sentence. Though presented through many witnesses, the mitigating factors are not substantial or significant enough to overcome the grave nature of the aggravating factors. While struggling with Young, Burns had ample time and the presence to mind to reflect upon his actions, to devise a method to take Young's revolver, and to consider the consequences of those actions, fully aware of their wrongful nature. Instead of merely disabling Young, Burns chose to murder the trooper. There was no moral or legal justification for Burns's actions.

- 4 -

Burns challenged his sentence in a Rule 3.850 motion to vacate sentence, which was denied and the denial affirmed on appeal.  <u>Burns v. State</u>, 944 So. 2d 234 (Fla. 2006) ("<u>Burns III</u>").  Similarly, the denial of his successive Rule 3.851 motion to vacate sentence was affirmed on appeal.  <u>Burns v. State</u>, 3 So. 3d 316 (Fla. 2009) ("<u>Burns IV</u>").

Remaining for review on the merits are two grounds (I and V) raised on the direct appeal from the re-sentencing, two grounds (II and III) raised in the first post-conviction appeal,[6] and one ground (VI) raised in the second post-conviction proceeding.  The grounds are addressed in that order.

## II.  STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding.  <u>Wilcox v. Florida Dep't of Corr.</u>, 158 F.3d 1209, 1210 (11th Cir. 1998), <u>cert. denied</u>, 531 U.S. 840 (2000).  Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[6]  Ground II, a claim of ineffective assistance of counsel, was asserted in the first motion for post-conviction relief.  While the appeal of that claim was pending, the Florida supreme court relinquished jurisdiction for consideration of Burns's claim that he is mentally retarded, which claim is asserted in Ground III.  <u>Burns III</u> rejected each ground.

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

In <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000), the Supreme Court

interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas
> court to grant a state prisoner's application for a writ of habeas corpus with
> respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1),
> the writ may issue only if one of the following two conditions is satisfied--the
> state-court adjudication resulted in a decision that (1) "was contrary to . . .
> clearly established Federal Law, as determined by the Supreme Court of the
> United States," or (2) "involved an unreasonable application of . . . clearly
> established Federal law, as determined by the Supreme Court of the United
> States."  Under the "contrary to" clause, a federal habeas court may grant the
> writ if the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law or if the state court decides a case differently than
> this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the writ if
> the state court identifies the correct governing legal principle from this Court's
> decisions but unreasonably applies that principle to the facts of the prisoner's
> case.

"The focus . . . is on whether the state court's application of clearly

established federal law is objectively unreasonable, . . . an unreasonable application

is different from an incorrect one." <u>Bell v. Cone</u>, 535 U.S. at 694.  "As a condition for

obtaining habeas corpus from a federal court, a state prisoner must show that the

state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." <u>Harrington v. Richter</u>, ___

U.S. ___, 131 S. Ct. 770, 786-87 (2011). <u>Accord</u> <u>Brown v. Head</u>, 272 F.3d 1308, 1313

(11th Cir. 2001) ("It is the objective reasonableness, not the correctness <u>per se</u>, of

the state court decision that we are to decide.").  The phrase "clearly established

Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). Federal courts must afford due deference to a state court's decision. "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, ____ U.S. ____, 130 S. Ct. 1855, 1866 (2010). See also Cullen v. Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted). Consequently, the decisions in Burns II and Burns III are entitled to deference.

Review of the state court decision is limited to the record that was before the state court.

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, i.e., the record before the state court.

Pinholster, 131 S. Ct. at 1398.  Burns bears the burden of overcoming a state court

factual determination by clear and convincing evidence.  "[A] determination of a

factual issue made by a State court shall be presumed to be correct.  The applicant

shall have the burden of rebutting the presumption of correctness by clear and

convincing evidence."  28 U.S.C. § 2254(e)(1).  This presumption of correctness

applies to a finding of fact but not to a mixed determination of law and fact.  Parker

v. Head, 244 F.3d 831, 836 (11th Cir.), cert. denied, 534 U.S. 1046 (2001).  Because

of the presumption of correctness and the highly deferential standard of review, the

analysis of each claim begins with the state court's analysis.

## III.  DIRECT APPEAL OF THE RE-SENTENCING

Burns asserts two claims from the direct appeal of the re-sentencing, the first

alleges trial court error and the second alleges prosecutorial misconduct.  Each

lacks merit.

### Ground I

The re-sentencing court violated the petitioner's
constitutional right not to testify by denying his request
for a "no adverse consequences" jury instruction.

Burns chose not to testify at the re-sentencing hearing.  The trial court

rejected his request for the following jury instruction (Respondent's Exhibit B-19 at

1974-75) (emphasis original):

A defendant in a criminal case has a constitutional right not to testify at any
stage of the proceedings.  You must not draw any inference from the fact that
a defendant does not testify.  Further, you must neither discuss this matter
or permit it to enter into your deliberations in any way.

Burns II, 699 So. 2d at 651-52, determined that, although the trial court erred by

rejecting the requested instruction, the error was harmless.

> We agree with Burns' contention that the Fifth Amendment right against
> self-incrimination, made applicable to the States through the Fourteenth
> Amendment, continues through the sentencing phase of a capital murder
> trial. See Estelle v. Smith, 451 U.S. 454, 462-63, 101 S. Ct. 1866, 1872-73, 68
> L. Ed. 2d 359 (1981); see also Lovette v. State, 636 So. 2d 1304 (Fla. 1994)
> (testimony introduced during guilt phase of murder trial that violated
> defendant's right not to incriminate self was harmful in sentencing phase);
> De La Paz v. State, 901 S.W.2d 571 (Tex. App. 1995) (defendant's right not to
> testify continues beyond conviction until after defendant has been sentenced).
> The defendant in a capital case cannot be penalized for exercising that right
> during the sentencing phase. The United States Supreme Court has
> recognized in Carter v. Kentucky, 450 U.S. 288, 101 S. Ct. 1112, 67 L. Ed. 2d
> 241 (1981), that a defendant who does not testify may suffer a penalty if "the
> jury is left to roam at large with only its untutored instincts to guide it." The
> jury may "draw from the defendant's silence broad inferences of guilt." Id.
> The Carter inference, i.e., unless properly instructed jurors will draw an
> adverse inference of guilt from a defendant's silence, is obviously inapplicable
> in the penalty phase (where guilt already has been established).
> Nevertheless, upon request, the trial judge should give a cautionary
> instruction to a newly impaneled penalty-phase jury because jurors still may
> draw adverse inferences from a defendant's silence. For instance, jurors may
> infer lack of candor concerning remorse or other mitigation if the defendant
> fails to testify. The trial court therefore erred in denying the requested
> instruction.[FN11]

> > [FN11] The standard instruction is routinely given, upon request,
> > in the guilt phase. See Fla. Std. Jury Instr. (Crim.) 4. We
> > conclude, based on our review of the trial court's hearing on
> > jury instructions, that the trial court denied the requested
> > instruction because it was not part of the Model Florida
> > Standard Criminal Jury Instructions for capital sentencing
> > proceedings. We request that the Committee on Standard Jury
> > Instructions in Criminal Cases draft a note that the instruction
> > is to be given in capital sentencing proceedings to a newly
> > impaneled penalty-phase jury if requested by the defendant.

> Although we find the trial court erred in refusing to give the instruction, we
> conclude that the error is subject to a harmless error analysis. Carter, on
> which Burns relies to argue that error cannot be harmless, does not support
> the conclusion that these errors are per se reversible. The court in Carter
> expressly declined to address whether the failure to give the requested
> instruction in the guilt phase amounted to reversible error. 450 U.S. at 304,

101 S. Ct. at 1121.  Nor has the United States Supreme Court in the years since <u>Carter</u> held the failure to give the requested instruction amounted to per se reversible error.  Other courts have likewise declined to find the error per se reversible in the guilt phase[FN12] or the sentencing phase.[FN13]

> [FN12]  <u>See</u> <u>Parker v. State</u>, 425 N.E.2d 628, 630 (Ind. 1981); <u>James v. Commonwealth</u>, 679 S.W.2d 238, 239 (Ky. 1984), <u>cert. denied</u>, 470 U.S. 1086, 105 S. Ct. 1849, 85 L. Ed. 2d 147 (1985); <u>Richardson v. State</u>, 402 So. 2d 848, 852 (Miss. 1981); <u>Franklin v. State</u>, 98 Nev. 266, 646 P.2d 543, 545 (1982).

> [FN13]  <u>See</u> <u>Beathard v. State</u>, 767 S.W.2d 423, 432 & n.16 (Tex. Crim. App. 1989).

We agree with the courts that have analyzed <u>Carter</u> and found that the failure to give the requested instruction is subject to harmless error review.  In reaching this conclusion, a number of these courts have recognized that <u>Carter</u> is closely aligned with the court's earlier decision in <u>Griffin v. California</u>, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965).  Specifically, <u>Carter</u> relies on <u>Griffin</u> for its conclusion that a defendant cannot be penalized for exercising his constitutional right not to testify.  In <u>Carter</u> the Court stated:

> The <u>Griffin</u> case stands for the proposition that a defendant must pay no court-imposed price for the exercise of his constitutional privilege not to testify.  The penalty was extracted in <u>Griffin</u> by adverse comment on the defendant's silence; the penalty may be just as severe when there is no adverse comment, but when the jury is left to roam at large with only its untutored instincts to guide it, to draw from the defendant's silence broad inferences of guilt.

<u>Carter</u>, 450 U.S. at 301, 101 S. Ct. at 1119.

In <u>Chapman v. California</u>, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), the court held that a violation like that which occurred in <u>Griffin</u> was subject to the harmless-error standard.  In <u>State v. DiGuilio</u>, 491 So. 2d 1129 (Fla. 1986), we similarly determined that a harmless error standard should apply to comments on a defendant's silence.  In light of <u>Carter</u>'s reliance on <u>Griffin</u>, we find that denial in a penalty phase of a requested instruction that no adverse inference may be drawn on a defendant's silence is subject to harmless error review.  <u>Cf.</u> <u>James v. Commonwealth</u>, 679 S.W.2d 238, 239 (Ky. 1984), <u>cert. denied</u>, 470 U.S. 1086, 105 S. Ct. 1849, 85 L. Ed. 2d 147 (1985); <u>Franklin v. State</u>, 98 Nev. 266, 646 P.2d 543, 545 (1982); <u>Beathard v. State</u>, 767 S.W.2d 423, 432 & n.16 (Tex. Crim. App. 1989). [FN14]

FN14 We recognize that in <u>Andrews v. State</u>, 443 So. 2d 78 (Fla. 1983), we found that a trial court's failure to give a complete "no adverse inference" instruction was reversible error. The trial judge in <u>Andrews</u>, without a request by the defendant, instructed the jury in the guilt phase that the defendant was not required to take the stand. <u>Id.</u> at 84. The trial judge, however, failed to instruct the jury that it could not draw any inference of guilt from the defendant's decision not to take the stand. <u>Id.</u> While we recognized that giving the complete instruction over defendant's objection would not have been error, we found that in light of <u>Carter</u>, the omission of the cautionary instruction required reversal. <u>Id.</u> <u>Andrews</u> is factually distinguishable from the instant case. Even if <u>Andrews</u> were not distinguishable, it was decided prior to <u>DiGuilio</u>.

The next question we must answer is whether the error in this case was harmless. We have held that reversal is not required if the State can show "beyond a reasonable doubt that the error complained of did not contribute to the jury's recommendation or, alternatively stated, that there is no reasonable possibility that the error contributed to the outcome." <u>DiGuilio</u>, 491 So. 2d at 1138.

In the present case, the defendant was found guilty by a properly instructed guilt-phase jury, and the newly impaneled penalty-phase jury voted unanimously for death. The court found three aggravating circumstances (which it merged into one), two statutory mitigating circumstances (including Burns' age of forty-two), and three general nonstatutory mitigating circumstances. The facts of this killing are egregious. On this record, we find the court's failure to give the requested instruction was harmless beyond a reasonable doubt. <u>See</u> <u>DiGuilio</u>, 491 So. 2d 1129 (Fla. 1986).

<u>Burns II</u> correctly held that the trial court erred by rejecting the "no adverse inference" instruction, an error that is subject to harmless error analysis. <u>United States v. Burgess</u>, 175 F.3d 1261, 1266 (11th Cir. 1999) ("[We] conclude that a trial court's failure to deliver a requested 'no-adverse-inference' instruction must be analyzed under the standard of constitutional harmless error."). Burns is entitled to no relief absent prejudice caused by the error. "[T]he standard for determining whether habeas relief must be granted is whether the error 'had substantial and

injurious effect or influence in determining the jury's verdict.'"  Brecht v.
Abrahamson, 507 U.S. 619, 623 (1993), quoting Kotteakos v. United States, 328
U.S. 750, 776 (1946).  "Under this standard, habeas petitioners may obtain plenary
review of their constitutional claims, but they are not entitled to habeas relief based
on trial error unless they can establish that it resulted in 'actual prejudice.'"
Brecht, 507 U.S. at 637.  Burns urges application of the "less onerous" harmless
error standard enunciated in Chapman v. California, 386 U.S. 18 (1967) (whether
the trial error is "harmless beyond a reasonable doubt"), which is the standard
Burns II applied.  But a federal court in a habeas proceeding must assess the
prejudicial impact of constitutional error in a state criminal trial under Brecht's
"substantial and injurious effect" standard.  Fry v. Pliler, 551 U.S. 112, 119 (2007).

　　　Burns is not, however, automatically entitled to a harmless error review
because Burns must first show that the state court's harmless error determination
was unreasonable.  "We may not grant respondent's habeas petition, however, if the
state court simply erred in concluding that the State's errors were harmless; rather,
habeas relief is appropriate only if the [state court] applied harmless-error review in
an 'objectively unreasonable' manner."  Mitchell v. Esparza, 540 U.S. 12, 18 (2003).

　　　Based on the egregious aggravating factors and the weak mitigating factors,
Burns cannot show that the harmless error determination in Burns II was
unreasonable.

<u>Ground V</u>

> Burns was deprived of a fair penalty phase due to
> prosecutorial misconduct in the form of an improper
> comparative worth argument.

According to <u>Burns I</u>, the prosecutor's closing argument in the original

penalty hearing unnecessarily focused on both the bad drug problem in the

community and the deceased's good background.  "The prosecutor described the

defendant as an evil supplier of drugs and contrasted him with the deceased.  These

emotional issues may have improperly influenced the jury in their

recommendation." <u>Burns I</u>, 609 So. 2d at 607.  The prosecutor from the original

penalty hearing also presented the state's closing argument at the re-sentencing.

Burns objected during the closing argument at the re-sentencing and argued that

the prosecutor was again asking the jury to "weigh the life of the trooper against

the life of the Defendant."  (Respondent's Exhibit B19 at 2000)  The judge excused

the jury from the courtroom (Respondent's Exhibit B-19 at 1997), considered

re-sentencing counsel's argument, and denied the objection.  The judge found that

the prosecutor's argument was not precluded by the holding in <u>Burns I</u>.  <u>Burns II</u>,

699 So. 2d at 653, agreed with the re-sentencing court that the prosecutor's closing

argument was not contrary to <u>Burns I</u>.

> We also reject Burns' claim that the prosecutor's closing argument violated
> this Court's mandate in <u>Burns I</u>.  The prosecutor in his closing argument did
> not contrast the defendant and the victim as did the prosecutor in the prior
> proceeding.  The prosecutor in closing merely asked the jury to consider the
> murder as a life-defining act rather than, as defense counsel presented it, a
> single isolated incident in Burns' life.  The prosecutor then argued that the

victim's actions prior to his death demonstrated his concern for others and his commitment to his duties as a law enforcement officer.

The earlier order (Doc. 23) recognized that part of the claim that Burns presented to the state court—that the prosecutor's argument was "unduly prejudicial"—was procedurally defaulted.[7]  The claim that Burns presents in his federal petition is that Burns II unreasonably determined the facts in ruling that the prosecutor's comments were not an invalid comparative worth argument.  Burns relies on Section 2254(d)(2), which permits a federal court to issue a writ of habeas corpus if the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Whether the factual determination was unreasonable is a question needing no answer in this habeas review because Burns's claim is not based on an alleged violation of federal law.  Wilson v. Corcoran ___ U.S. ___, 131 S. Ct. 13, 16-17 (2010), issued after the earlier order, explains:

> [I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts.  The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  And we have repeatedly held that "'federal habeas corpus relief does not lie for errors of state law.'"  Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990)).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  502 U.S. at 67-68, 112 S. Ct. 475 . . . .

---

[7]  Burns omits the "unduly prejudicial" argument in his federal petition.

> Nor did it suffice for the Court of Appeals to find an unreasonable determination of the facts under 28 U.S.C. § 2254(d)( 2).  That provision allows habeas petitioners to avoid the bar to habeas relief imposed with respect to federal claims adjudicated on the merits in state court by showing that the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  It does not repeal the command of § 2254(a) that habeas relief may be afforded to a state prisoner "only on the ground" that his custody violates federal law.

Burns's basic contention—whether <u>Burns II</u> correctly determined that the prosecutor's argument was not a violation of <u>Burns I</u>—presents no federal issue because a federal court has no supervisory or appellate authority over a state court. <u>See</u> <u>Bolender v. Singletary</u>, 16 F.3d 1547, 1570 (11th Cir.1994) ("[F]ederal courts do not sit to revisit a state supreme court's judgment as to whether the trial court complied with state law."); <u>McCullough v. Singletary</u>, 967 F.2d 530, 535-36 (11th Cir. 1992) ("A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."), <u>cert. denied</u>, 507 U.S. 975 (1993).   Burns's argument is premised on the mistaken belief that <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991), prohibits "comparative worth" arguments.  <u>Payne</u> addresses the admissibility of victim impact evidence.  The reference to "comparative worth" was dicta.  Only Supreme Court holdings can create clearly established federal law.  "A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of this Court." <u>Thaler v. Haynes</u>, ___ U.S. ___, 130 S. Ct. 1171, 1173 (2010).  The clearly established legal principle relied upon "must be United States Supreme Court precedent, not state-law precedent, that is contravened or

unreasonably applied . . . . <u>Marshall v. Sec'y, Fla. Dep't of Corr.</u>, 610 F.3d 576, 583 (11th Cir. 2010), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom</u> <u>Marshall v. Buss</u>, ___ U.S. ___, 131 S. Ct. 1809 (2011).

Further, Burns misreads <u>Payne</u>'s "comparative worth" statement and its purported applicability to his situation.  Burns complains that the prosecutor compared the worth of his life to that of the victim.  <u>Payne</u>'s caution, 501 U.S. at 823 (italics original), is against comparing the worth of different victims, not the defendant to the victim.

> Payne echoes the concern voiced in <u>Booth [v. Maryland</u>, 482 U.S. 496 (1987)] . . . that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. <u>Booth</u>, <u>supra</u>, 482 U.S., at 506, n.8, 107 S. Ct., at 2534 n.8.  As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind—for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not.  It is designed to show instead *each* victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be.

Circuits courts that have addressed this issue concur that <u>Payne</u> is no obstacle to victim-to-defendant comparisons.  <u>See</u> <u>Jackson v. Johnson</u>, 523 F.3d 273, 280 (4th Cir.) ("In light of <u>Payne</u>'s silence regarding victim-to-defendant comparisons, we cannot say that the Supreme Court of Virginia unreasonably applied <u>Payne</u> in rejecting Jackson's purported comparative-worth argument."), <u>cert.</u> <u>denied</u>, ___ U.S. ___, 129 S. Ct. 7 (2008); <u>United States v. Fields</u>, 483 F.3d 313, 340 (5th Cir. (2007) ("[T]o the extent that the Court expressed disapproval of comparative worth arguments, it did so only with regard to victim-to-victim comparisons, not

victim-to-defendant comparisons."), cert. denied, 552 U.S. 1144 (2008).

Consequently, Ground V presents no reviewable federal issue.

## IV.  FIRST POST-CONVICTION PROCEEDING

### A.  Ineffective Assistance of Counsel

Burns asserts one claim of ineffective assistance of counsel, a difficult claim to sustain.  "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994)).  Strickland v. Washington, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented.  In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims.  According to Strickland, first, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Strickland, 466 U.S. at 687, 104 S. Ct. 2052.

Sims v. Singletary, 155 F.3d 1297, 1305 (11th Cir. 1998).

Strickland requires proof of both deficient performance and consequent prejudice.  Strickland, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); Sims, 155 F.3d at 1305 ("When applying Strickland, we are free to dispose of ineffectiveness claims on either of its

two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Strickland</u>, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. <u>Strickland</u> requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Burns must demonstrate that counsel's error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691-92. To meet this burden, Burns must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

<u>Strickland</u> cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91. Burns cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done.  Nor
> is the test even what most good lawyers would have done.  We ask only
> whether some reasonable lawyer at the trial could have acted, in the
> circumstances, as defense counsel acted at trial . . . .  We are not interested in
> grading lawyers' performances; we are interested in whether the adversarial
> process at trial, in fact, worked adequately.

White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992).  Accord Chandler v.

United States, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious:  the trial

lawyers, in every case, could have done something more or something different.  So,

omissions are inevitable . . . .  [T]he issue is not what is possible or 'what is prudent

or appropriate, but only what is constitutionally compelled.'") (en banc) (quoting

Burger v. Kemp, 483 U.S. 776, 794 (1987)).  See also Jones v. Barnes, 463 U.S. 745,

751 (1983) (counsel has no duty to raise a frivolous claim).

Burns must prove that the state court's decision was "(1) . . . contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States or (2) . . . based on an

unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d).  In determining "reasonableness," a

federal petition for the writ of habeas corpus authorizes an independent assessment

of "whether the state habeas court was objectively reasonable in its Strickland

inquiry" but not an independent assessment of whether counsel's actions were

reasonable.  Putnam v. Head, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001), cert.

denied, 537 U.S. 870 (2002).  Sustaining a claim of ineffective assistance of counsel

is very difficult because "[t]he standards created by Strickland and § 2254(d) are

both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."
<u>Richter</u>, 131 S. Ct. at 788.  <u>See also</u> <u>Pinholster</u>, 131 S. Ct. at 1410 (A petitioner must
overcome this "'doubly deferential' standard of <u>Strickland</u> and the AEDPA."), and
<u>Johnson v. Sec'y, Dep't of Corr.</u> ,643 F.3d 907, 911 (11th Cir. 2011) ("Double
deference is doubly difficult for a petitioner to overcome, and it will be a rare case in
which an ineffective assistance of counsel claim that was denied on the merits in
state court is found to merit relief in a federal habeas proceeding.").

  <u>Burns III</u>, 944 So. 2d at 239, denied the claim of ineffective assistance of
counsel with the following introduction.

> To establish a claim of ineffective assistance of counsel, a defendant must
> show both that counsel's performance was deficient and that the defendant
> was prejudiced by that deficiency.  <u>Strickland v. Washington</u>, 466 U.S. 668,
> 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  An attorney's performance is
> deficient when it falls below an objective standard of reasonableness under
> prevailing professional norms.  <u>Id.</u> at 688, 104 S. Ct. 2052.  Prejudice is
> demonstrated when "there is a reasonable probability that but for counsel's
> unprofessional errors, the result of the proceeding would have been different.
> A reasonable probability is a probability sufficient to undermine confidence in
> the outcome."  <u>Id.</u> at 694, 104 S. Ct. 2052.  In addition, "[a] fair assessment of
> attorney performance requires that every effort be made to eliminate the
> distorting effects of hindsight, to reconstruct the circumstances of counsel's
> challenged conduct, and to evaluate from counsel's perspective at the time."
> <u>Id.</u> at 689, 104 S. Ct. 2052.  This Court has stated: "Counsel cannot be
> deemed ineffective merely because current counsel disagrees with trial
> counsel's strategic decisions.  Moreover, strategic decisions do not constitute
> ineffective assistance of counsel if alternative courses have been considered
> and rejected and counsel's decision was reasonable under the norms of
> professional conduct."  <u>Occhicone v. State</u>, 768 So. 2d 1037, 1048 (Fla. 2000)
> (citations omitted).

Because the state court correctly recognized that <u>Strickland</u> governs each claim of
ineffective assistance of counsel, Burns cannot meet the "contrary to" test in Section

2254(d)(1).  Instead Burns must show that the state court unreasonably applied
<u>Strickland</u> or unreasonably determined the facts.

Ground II

Re-sentencing counsel were ineffective for failing to<br>present available mental mitigation evidence.

At the original penalty hearing, which concluded with Burns's receiving a
death sentence, the defense presented substantial expert testimony by Dr. Berland
(who opined that Burns suffered from an extreme emotional or mental disturbance)
and limited character testimony by three family members.  The two public
defenders who represented Burns at the re-sentencing hearing, attorneys who did
not represent Burns in the original trial, had the advantage of knowing that a
mental mitigation strategy was unsuccessful in avoiding the earlier death sentence.
In preparing for the re-sentencing hearing, defense counsel considered again
presenting Dr. Berland.  But, trying to save Burns's life, counsel ultimately chose
instead to "humanize" Burns by presenting more than thirty character witnesses.
<u>Burns III</u>, 944 So. 2d at 240-42 (ellipsis and brackets original), reviewed defense
counsel's "humanization" strategy as follows:

> Although counsel did not present any expert testimony on mental mitigation,
> the defense did present over thirty witnesses at the re-sentencing, who were
> mainly family members and close friends of Burns.  They testified about the
> important role Burns played in their family.  Burns was described as a leader
> of the family, and many witnesses testified about the amount of support he
> provided to them.  For example, the defendant's mother, Ethel Burns,
> testified that after the defendant left his family home in Mississippi, he
> continued to send money home.  One family member described him as a role
> model.  One of his sisters stated that he was "smart, loving and caring."  The
> defense witnesses at re-sentencing also repeatedly noted that Burns was not

- 21 -

a violent person and that this crime was completely out of character for him.
Albert Rance, a family friend who had known the defendant since he was a
child, testified that he had never known Burns to be violent or have a temper.
Barbara A. Burns, the defendant's niece, testified that she had "never heard
him behave improperly" or "even yell."  Burns' co-counsel . . . stated that the
strategy at re-sentencing was:

> [T]o show that Daniel Burns had no significant history of prior
> criminal activity; that he had lived a life of overcoming . . . [an]
> extremely difficult poverty-ridden childhood to be a
> hardworking man; that he had very strong ties to his family.
>
> . . . And [that Burns] was the supporter of all the people in that
> family and aided and assisted them, including his children.

The defense also called Dr. Michael Radelet, a sociology professor at the
University of Florida.  Dr. Radelet testified regarding the ability of a prisoner
to adjust to confinement and future dangerousness.  Dr. Radelet noted that in
making assessments of a prisoner's potential future dangerousness, he takes
into account seven factors, one of which is substance abuse or a history of
mental hospitalizations.  He noted: "You can tell if somebody's had problems
with alcohol or drug abuse or mental hospitalizations, especially mental
hospitalizations.  They're more difficult to predict about what's going to go
on."  He noted that if a prisoner was psychotic, "that leads to
unpredictability."  Dr. Radelet stated that he "believe[d] very, very strongly
that Mr. Burns shows all the traits necessary in order for me to be able to
predict that he will be able to make a satisfactory adjustment to life in prison
should he be sentenced to life in prison, and that he would do so without
threatening guards or other inmates or being at all disruptive to the life in
the prison."

During closing arguments, re-sentencing co-counsel . . . summarized this
evidence:

> It would be difficult for me to imagine being able to present this
> much mitigating evidence on behalf of any defendant.  This is a
> rare case where we have a human being, Daniel Burns, who
> has touched so many lives, so many people.
>
> . . . .
>
> Even more importantly in this case, Members of the Jury, is all
> of the evidence presented about Daniel Burns' life, his
> background, his character, and his family.  A man must be
> judged on his whole life, not just on one incident.  And all of the
> evidence that we've presented demonstrates that this crime

was totally out of character for Dan Burns, and that is why this evidence is so important.

. . . .

The central fact we've established through the testimony of all of his brothers and sisters is that Daniel Burns has occupied a leadership role in his family . . . .  You've heard from each of the nieces . . . that [Burns] was also a surrogate father . . . .  [E]ach of these kids, he was a dad to, a brother to, and an uncle to.

To his younger brothers and sisters . . . [Burns] was a teacher, a counselor, a source of love.  A source of love, affection and emotional support.  And he even continues to do that to this day.

. . . .

We have also established that Daniel Burns will likely be a model prisoner in the future and not pose a danger to anyone. Now, of course, it is difficult to predict the future that Michael Radelet has completed study after study on this phenomena of future dangerousness, and he has identified, as you recall, seven certain fixed criteria.

In every single case, with all seven, [Burns is] at the best end of the scale.  And not only will Daniel not be a danger in the future, he can provide guidance and support to the younger inmates who might be incarcerated there.

In the state post-conviction proceedings Burns received an evidentiary

hearing on his claims of ineffective assistance of counsel, at which Burns presented

the testimony of his two re-sentencing attorneys, Dr. Berland (who testified at the

original penalty hearing but not the re-sentencing hearing), and Dr. Dee (who

performed a neuropsychological evaluation of Burns in preparation for the

post-conviction evidentiary hearing).  According to Burns III, 944 So. 2d at 242-43,

the post-conviction court, discussed the issues re-sentencing counsel faced in

determining whether to present Dr. Berland's testimony:

At the evidentiary hearing, Burns presented testimony in an attempt to
challenge this record evidence.  Burns' re-sentencing counsel . . . testified that
after reading Dr. Berland's testimony from the first sentencing, he decided
that he would call Dr. Berland for the purpose of presenting mental
mitigation testimony.  [Defense counsel] testified that there was no strategic
reason why Dr. Berland or another mental health expert did not ultimately
testify at Burns' re-sentencing.  He recalled that Dr. Berland was not called
because Dr. Berland had a death in his family.  [Defense counsel] could not
explain why he did not inform the trial court of the situation, other than to
say that he was "just maybe a bit overwhelmed by the entire proceedings."

Co-counsel . . . also testified at the evidentiary hearing.  Although [co-counsel]
believed that Dr. Berland was going to be called as a re-sentencing witness,
he maintained that whether to call Dr. Berland was [lead defense counsel]'s
decision to make.  Co-counsel did not feel that Dr. Berland's testimony would
be inconsistent with the testimony of other mitigation witnesses.

Dr. Berland also testified at the evidentiary hearing.  He noted that he would
have given testimony in [re-sentencing] similar to his testimony in [the
original penalty hearing]:  that Burns suffers from a chronic ambulatory
psychotic disturbance, has a brain injury, and suffered from an extreme
mental or emotional disturbance at the time of the murder.[FN9]  Dr. Berland
testified that the effect of Burns' mental illness on Burns during his confron-
tation with the victim was "a very delicate area to walk on" but felt that
whatever misunderstanding occurred between Burns and the victim, Burns'
reaction would have been significantly inflamed by his mental illness.

> [FN9]  The post-conviction court noted, however, that Dr. Berland
> had no evidence "that Burns suffered from delusions or
> hallucinations at the time of the shooting, nor had he noted
> anything in the police statements in 1988 that indicated Burns
> was suffering from mental illness."  Post-conviction Order at 7.

The final witness at the evidentiary hearing, Dr. Henry Dee, testified that he
performed a neuropsychological evaluation of Burns.  Dr. Dee believed that at
the time of the murder, Burns was under the influence of extreme mental or
emotional disturbance, and his capacity to appreciate the criminality of his
conduct or conform his conduct to the requirements of law was substantially
impaired.

In denying this claim, the post-conviction court considered the above evidence
but still rejected Burns' ineffective assistance claim, noting:

> At the evidentiary hearing, neither [defense counsel] nor
> [co-counsel] could offer any explanation for their failure to call
> Dr. Berland at the re-sentencing proceeding.  As well, Dr.

Berland had absolutely no independent recollection of why he
was not called to testify, either at the re-sentencing hearing or
at the <u>Spencer</u> hearing.  Given the lack of recollection by the
witnesses at the evidentiary hearing, [post-conviction counsel]'s
allegations as to Dr. Berland's unavailability to testify as to
Re-sentence Counsel's strategy must be evaluated from
counsel's perspective at the time of the re-sentencing
proceeding.  Post-conviction Order at 9.

Immediately following the above quotation, but omitted from <u>Burns III</u>, the

post-conviction court further discussed the issues that re-sentencing counsel faced

and counsel's obvious struggle with deciding whether to present Dr. Berland's

testimony (Respondent's Exhibit D-3 at 9-12) (emphasis original) (citation to record

omitted):

[Prosecutor]:  We have one issue, yes, that I think we ought to
talk to the Court about.  And that is about expert witnesses; if
there are any.

The last time in this case, two doctors testified.  Doctor Berland
testified for the Defense and Doctor Merin testified for the
State.

We have no idea—discovery wasn't initiated in this proceeding
and we really have no idea about whether Doctor Berland is
going to testify this time or not, and we're not asking for the
Defense to really tell us that at this time.  The only thing we
would like the Court to know is that if Doctor Berland does in
fact testify—we have a rebuttal psychologist available to
testify.  But in order for him to testify in rebuttal, he basically
needs all of the reports, testing, physical evidence that Doctor
Berland is using to base his testimony on, and he basically also
needs to know what Doctor Berland said in order to do that.

So we would at least, at the very least, request the Court to
order the Defense, should Doctor Berland testify, to bring with
him all of the information that he has about Mr. Burns,
specifically the testing, with him to court so that our doctor
may be able to review that prior to his testimony.

We would also ask the Court for time—at least some time after Doctor Berland's testimony for Doctor Merin to be able to review that and to review his testimony.

THE COURT:  [Defense Counsel]?

[Defense Counsel]:  I don't really have any serious objections to that, Your Honor.

I can tell the Court and the State, **Doctor Berland, if he is called**, would not be called Monday.  So Doctor Merin would not need to be here on Monday.

**And other than that, I'm not going to say too much.  But if he does testify**, I don't see any problem with him bringing his test results and copies of that to provide to the State.

The subject of Dr. Berland's testimony arose again shortly thereafter:

[Defense Counsel]:  Then, Your Honor, Doctor Berland, who the Defense has retained in this case, he was out of town last week to tend to his father who has been very sick.  While he was doing that, his grandmother passed away.  The funeral for his grandmother is tomorrow and then he'll be flying back into Tampa tomorrow evening.  He would be available Wednesday morning.

**I don't know at this point in time whether we plan to call Doctor Berland or not, and I've mentioned that to [the prosecutor]**.  So Doctor Merin wouldn't have to be present tomorrow because Doctor Berland would definitely not be available tomorrow.

We will try to make our decision with respect to calling Doctor Berland so that we can let the Court know that tomorrow so that we—we won't come in on Wednesday and surprise you, if the Court sees what I'm saying.

As well, prior to the <u>Spencer</u> hearing, [defense counsel] sent a letter to Dr. Berland, again expressing uncertainty as to whether Berland would be called to testify at this hearing.  Dr. Berland read from this letter at the evidentiary hearing, in part as follows:

Okay.  "Doctor Berland, I wanted to thank you again for all of your hard work on the Daniel Burns case.  It is always a

pleasure to work with you and I believe that you are a true professional."

"As you have probably heard by now, the Jury returned a unanimous recommendation of death in Daniel Burns' case.  As disappointed as I am with the verdict, I do feel confident that we will ultimately prevail on our legal issues."

"Judge Logan has scheduled a hearing for May 27th at 9:00 a.m. for the purpose of taking additional testimony or argument.  **We are considering calling you as a witness for that hearing**.  Please let me know if that would present a conflict for you and whether you would need a subpoena.  **I will try to decide within the next two weeks whether you will be called**.  Again, thank you for your hard work on this case.  Perhaps we can work together again soon.

My condolences on the loss of your grandmother, and I hope that your father continues to improve."

The cases relied upon by [post-conviction counsel] to contend that Re-sentence Counsel were ineffective for failing to present mental mitigation evidence are all distinguishable.  See e.g., Middleton v. Dugger, 849 F.2d 491 (11th Cir. 1988); Hildwin v. Dugger, 654 So. 2d 107 (Fla. 1995);  State v. Michael, 530 So. 2d 929 (Fla. 1988). These cases involve findings of ineffective counsel premised upon defense counsel's almost total failure to conduct any background investigation into psychiatric mitigating evidence that was shown to be reasonably available.  See Middleton, 849 F.2d at 493-495; Hildwin, 654 So. 2d at 109-110.

In Burns' case, however, the alleged mental mitigation evidence was actively sought out, evaluated by counsel with knowledge of the likely rebuttal evidence and, as the previous transcript excerpts demonstrate, a reasoned decision was made not to present the testimony in light of the other "theme" evidence presented on Burns' behalf.  The record in this case strongly supports and convinces this Court to find that Re-sentence Counsel's alleged failure to present a "mental illness" factor was not an oversight but, rather, was a tactical choice.  "[S]uch a choice must be given a strong presumption of correctness and the inquiry is generally at an end."  Middleton, 849 F.2d at 493.

After considering the above evidence from the evidentiary hearing and the

state post-conviction court's determination, Burns III, 944 So. 2d at 243-44, holds

that trial counsel's decision to not present the mental health testimony of Dr.

Berland was a reasonable strategic decision.

> There is competent, substantial evidence to support the post-conviction court's finding that re-sentencing counsel made a strategic decision not to present mental mitigation evidence. Porter v. State, 788 So. 2d 917, 923 (Fla. 2001) ("So long as its decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact . . . ."). The post-conviction court's finding is supported by the transcript of the re-sentencing, which indicates that [defense counsel] considered but eventually rejected the idea of calling Dr. Berland. The record of the re-sentencing demonstrates that the defense strategy was as co-counsel . . . stated it to be, which was to show that Burns had been a productive member of society who supported and led his family. Counsel also showed through Dr. Radelet that Burns could continue to lead a productive life in prison. Dr. Berland's testimony that Burns suffered from a psychotic disturbance would have undermined the positive traits accentuated by the mitigation evidence presented and vitiated Radelet's re-sentencing testimony predicting that Burns would make an excellent adjustment to prison life. The sum of the re-sentencing evidence does not support counsel's post-conviction testimony.

> Rather, the evidence supports the post-conviction court's factual finding that Burns' re-sentencing counsel were considering calling Dr. Berland but subsequently made a strategic decision not to do so. The fact that re-sentencing counsel testified that there was not a strategic reason for not presenting mental mitigation does not require the post-conviction court to find ineffective assistance. See Breedlove v. State, 692 So. 2d 874, 877 n.3 (Fla. 1997) ("[A]n attorney's own admission that he or she was ineffective is of little persuasion in these proceedings."). We do not find error with the post-conviction court's decision because it is based on competent, substantial evidence and it is consistent with the evidence in the trial record.[FN10]  The evidence presented at the post-conviction hearing would have conflicted with re-sentencing counsel's trial strategy.

>> [FN10]  In Rutherford v. State, 727 So. 2d 216, 223 (Fla. 1998), this Court held that a trial court did not err in finding that trial counsel was not deficient for failing to present mental health testimony, when "trial counsel was aware of possible mental mitigation, but made a strategic decision under the circumstances of this case to instead focus on the 'humanization' of [the defendant] through lay testimony." Id. In the instant case, re-sentencing counsel were admittedly aware of, and had extensively investigated, the potential mental mitigation testimony. This investigation distinguishes

the instant case from those cases cited by Burns for support of
his argument.  See, e.g., Hildwin v. State, 654 So. 2d 107, 109
(Fla. 1995) (penalty-phase counsel was ineffective because he
"failed to unearth a large amount of mitigating evidence").

Moreover, we agree with the post-conviction court that Burns failed to prove
the prejudice prong of the Strickland analysis.  The court wrote:

> The mental mitigation evidence that Burns alleges should have
> been offered at the re-sentencing proceeding would have
> contradicted the testimony of the numerous lay witnesses who
> espoused nothing but positive "role model" traits to humanize
> Burns.  The testimony of the numerous lay witnesses at the
> re-sentencing proceeding revealed that those who knew Burns
> thought he was a good person who had never exhibited any
> violent behavior.  The proposed mental mitigation evidence
> would also have detracted from the expert testimony of
> Professor Radelet, who characterized Burns as a productive
> person who would be able to make a satisfactory adjustment to a
> life sentence in prison.

As well, had Re-sentence Counsel called Dr. Berland, they would have had to
negate the testimony of the State's rebuttal expert witness, Dr. Merin, who
would have testified, in accord with his testimony at the original trial, that
there was no evidence that Burns was psychotic and that he was not under an
extreme emotional or mental disturbance at the time he shot Trooper Young
. . . .  This Court is also mindful that far less lay testimony was presented at
the original trial and both Dr. Berland and Dr. Merin testified.  Yet, the jury
returned an advisory sentence of death, and the Court imposed a death
sentence on Burns.

Post-conviction Order at 13.  We find no error in the trial judge's
determination on prejudice.  We thus affirm the post-conviction court's denial
of this claim.

To prove ineffective assistance of counsel, Burns must prove both deficient

performance and prejudice.  Both the post-conviction court and the supreme court

determined that Burns failed to prove prejudice.  Re-sentencing counsel knew that a

mental mitigation strategy failed the first time.  Burns III correctly determined that

(1) the presentation of Dr. Berland's mental mitigation evidence would have

contradicted the more than thirty character witnesses and (2) the state could have largely offset Dr. Berland's testimony with the testimony of Dr. Merin.

In a federal habeas case, trial counsel's strategic decisions and a state court's determination are both entitled to deference, described as "double deference" in Pinholster, 131 S. Ct. at 1410, and Johnson, 643 F.3d at 911.  This deference applies even when counsel decides not to present mental mitigation evidence. "[U]nder § 2254(d)(2), the state court's finding that Wood's counsel made a strategic decision not to pursue or present evidence of Wood's mental deficiencies was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings."  Wood v. Allen, ___, U.S. ___ 130 S. Ct. 841, 849 (2010). Wood's IQ test scores were lower (in the sixties) than Burns's (in the seventies) and Wood was considered in the borderline range of intellectual functioning.  Wood's reading ability was below a third grade level and he was classified by his former special education teacher as "educable mentally retarded."  The dissent describes Wood as having "the type of significant mental deficits that we recognize as 'inherently mitigating . . . ."  Wood, 130 S. Ct. at 852 (Stevens, J., dissenting).  The state court found that "Wood was not mentally retarded because, while his full-scale IQ was 64 and his true IQ was between 61 and 69, Wood did not have significant or substantial deficits in his adaptive functioning."  Wood v. Allen, 542 F.3d 1281, 1286 (11th Cir. 2008).   Nevertheless, Wood, 130 S. Ct. at 850 n.3, deferred to counsel's strategic decision not to present the mental mitigation evidence.

> Wood's mental deficiencies also could have undercut the defense's argument
> that [Wood] left school to support his family, suggesting instead that he left
> school because of educational difficulties.  Counsel's decision about which
> avenues to investigate can therefore plausibly be described as strategic rather
> than necessarily being the product of "happenstance, inattention, or neglect."

Wood's mental deficiencies were worse than Burns's, yet counsel's decision to forego

mental mitigation evidence was not unreasonable.  Additionally, re-sentencing

counsel avoided a "battle of experts" by concentrating on "humanizing" Burns with

more than thirty character witnesses.  Burns III is not an unreasonable application

of Strickland.

## B.  MENTAL RETARDATION

### Ground III

> The petitioner is mentally retarded and his sentence of
> death is therefore barred by the eighth amendment.

Atkins v. Virginia, 536 U.S. 304 (2002), holds that the Eighth Amendment's

"cruel and unusual punishment" clause prohibits executing the mentally retarded.

Burns alleges that he meets the statutory definition of "mental retardation."  Burns

cannot meet the "contrary to" test because Burns III, 944 So. 2d at 238, recognized

that Atkins governs.  Consequently, Burns must prove that the state court either

unreasonably applied Atkins or unreasonably determined the facts.

While the denial of post-conviction relief was pending on appeal, Burns

succeeded in having jurisdiction relinquished to the circuit court to determine

whether, under Atkins, Burns is mentally retarded and, as a consequence, ineligible

for the death penalty.  The circuit court rejected the claim after considering the

testimony of Burns's expert witness (Dr. Dee) and the state's expert witness (Dr.

Gamache).  <u>Burns III</u>, 944 So. 2d at 245-49 (a footnote omitted), upheld the rejection

of this claim as follows:

> Finally, Burns challenges the circuit court's determination that he is not
> mentally retarded in accordance with Florida Rule of Criminal Procedure
> 3.203.  Rule 3.203(b) provides:
>
>> As used in this rule, the term "mental retardation" means
>> significantly subaverage general intellectual functioning
>> existing concurrently with deficits in adaptive behavior
>> and manifested during the period from conception to age 18.
>> The term "significantly subaverage general intellectual
>> functioning," for the purpose of this rule, means performance
>> that is two or more standard deviations from the mean score
>> on a standardized intelligence test authorized by the
>> Department of Children and Family Services in rule 65B-4.032
>> of the Florida Administrative Code.  The term "adaptive
>> behavior," for the purpose of this rule, means the effectiveness
>> or degree with which an individual meets the standards of
>> personal independence and social responsibility expected of his
>> or her age, cultural group, and community.
>
> Thus, Burns must prove the following three elements:  (1) significant
> subaverage general intellectual functioning; (2) deficits in adaptive behavior;
> and (3) manifestation before age 18.
>
> ### 1.  Evidentiary Hearing
>
> At the supplemental hearing on this issue, the defendant first presented the
> testimony of Dr. Henry Dee, a clinical psychologist specializing in
> neuropsychology, who also testified at the original post-conviction evidentiary
> hearing.  Dr. Dee administered the Wechsler Adult Intelligence Scale, Third
> Edition (WAIS-III) to Burns in 2000, concluding that his full scale IQ was 69.
> Dr. Dee testified that this score was more than two standard deviations from
> a mean IQ score of 100, thus indicating that Burns has significantly
> subaverage intellectual functioning within the meaning of rule 3.203.
>
> Dr. Dee testified that based on an initial impression of Burns' work history
> and background, he did not think that Burns met the other two prongs of the
> definition for mental retardation.  However, after further investigations and
> reviewing the record, he concluded otherwise.  First, he noted that although

Burns graduated from high school, the schools that he attended were known to simply pass students who behaved and did not cause trouble—they had an unspoken policy of "social promotion."  Dr. Dee learned of this policy after speaking to some of Burns' siblings and a retired teacher who taught in Mississippi schools.  Dr. Dee reviewed Burns' school records and determined that his consistent grades of 70, the lowest grade Burns could receive and still pass the grade level, were highly suspect, and so he concluded that Burns was likely simply promoted through grade levels without actually performing at the required passing level.  Dr. Dee interviewed several of Burns' siblings, who reported that he performed relatively poorly in school.

Second, Burns' military records, according to Dr. Dee, indicated that Burns had trouble paying attention to instructions and was behind the rest of his class in all phases of his training.  The records consistently indicated that all of his trainers recommended that he be separated from the service because of his lack of progress and intelligence.  Dr. Dee theorized that the only reason Burns had been able to get into the military was that the entrance exams were verbal, noting that the subtests revealed that Burns performed significantly better on verbal IQ subtests.[FN11]

> [FN11]  Burns' verbal IQ was 79, while his performance IQ was 62.

Finally, Dr. Dee noted that although Burns co-owned and ran a business with his sister, it was his sister who was responsible for the books and running of the business and that Burns was essentially a crew leader and driver.  Dr. Dee concluded that the rest of the jobs that Burns held were simple employment and that people with mild mental retardation [FN12] were capable of holding these types of jobs.

> [FN12]  Mild mental retardation means that the person has an IQ in the range of 55 to 70.

The State then presented the testimony of Dr. Michael Gamache, a clinical psychologist.  Dr. Gamache reported that he reviewed large volumes of records, including examinations of Burns that had been done by other doctors in the past, transcripts from various stages of the case, and other background and historical information.  Dr. Gamache also administered the WAIS-III test and determined that Burns had a full scale IQ score of 74.  On the subtests Burns scored a performance IQ of 64, a perceptual organization IQ of 67, a verbal comprehension IQ of 78, a verbal IQ of 85, and a working memory IQ of 92.  Dr. Gamache noted that he thought that in determining mental retardation, he had to take into account all of these subtest scores because people who are mentally retarded typically have consistently low scores in each of these subtests.  Dr. Gamache also noted that the high subtest scores

were consistent with scores Burns had received on previously administered
IQ tests in 1988 and 1993.

Dr. Gamache testified that in his opinion there was no evidence that Burns
met the statutory definition of mental retardation.  He stated that the
discrepancy in the subtest scores indicated that Burns has a significant
cognitive or neuropsychological deficit that relates to his visual and spatial
skills.  Dr. Gamache noted that Burns is an effective communicator and fully
able to care for himself because he engages in various correspondence in
prison and keeps himself well-groomed.  Dr. Gamache also did not think that
Burns' military records could support a finding of mental retardation because
Burns' failure to succeed in the military was a combination of his depression,
lack of motivation, racism that he faced, as well as low intelligence.  Dr.
Gamache thought that the jobs that Burns has held also reflected that he did
not meet the adaptive functioning prong.  He noted that Burns' sister stated
in her previous testimony at re-sentencing that it was Burns' idea to start
their business.

### 2. Standard of Review

Burns first argues that this Court should review the circuit court's
determination of mental retardation on a de novo standard.  However, in
reviewing a determination of mental retardation in previous cases, we have
employed the standard of whether competent, substantial evidence supports
the circuit court's determination.  See Trotter v. State, 932 So. 2d 1045, 1049
(Fla. 2006).  In the instant case, we conclude that competent, substantial
evidence supports the circuit judge's determination that Burns is not
mentally retarded.

### 3. Intellectual Functioning

As to the first prong, the experts received different scores when they
administered the IQ tests.  Burns scored an IQ of 69 on Dr. Dee's test, while
he scored an IQ of 74 on Dr. Gamache's test.  Thus, there is evidence that he
meets this prong because he received at least one IQ score within the mental
retardation range.  However, Dr. Gamache's testimony provided competent,
substantial evidence to explain why Burns' low IQ scores do not necessarily
mean that he is mentally retarded.  Dr. Gamache explained that in analyzing
a variety of subtests, he found that Burns' verbal IQ scores were well above
the range typically associated with mental retardation.  Dr. Gamache
theorized that his range of subtest scores indicates that Burns has a
significant intellectual deficit that is specific and circumscribed and related to
his visual and spatial skills.  The circuit court found this to be a credible
explanation for Burns' low IQ and determined that Burns does not meet the
first prong of rule 3.203.  Credibility is a determination made by the circuit

Case 8:07-cv-01275-SDM-AEP   Document 31   Filed 08/10/11   Page 35 of 43 PageID 648

court, which this Court defers to provided that there is competent, substantial evidence to support that determination.  <u>Porter v. State</u>, 788 So. 2d 917, 923 (Fla. 2001).  We have stated that we "recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact."  <u>Id.</u>  We thus find that there is competent, substantial evidence to support the circuit court's conclusion that Dr. Gamache's testimony that Burns does not meet this first prong of the mental retardation determination was the more credible expert testimony.

4. Adaptive Behavior

Even if we concluded that Burns demonstrated that his intellectual functioning was significantly subaverage, he still must meet the other two prongs of the mental retardation standard in rule 3.203.  Low IQ alone does not necessarily mean that a person is mentally retarded.  <u>Rodriguez v. State</u>, 919 So. 2d 1252, 1266 (Fla. 2005).  The second prong is that the defendant must show a deficit in his adaptive behavior.  In addressing this prong, we have noted:

> According to the Diagnostic and Statistical Manual of Mental Disorders, mental retardation is "characterized by significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39 (4th ed. 2000).  Even where an individual's IQ is lower than 70, mental retardation would not be diagnosed if there are no significant deficits or impairments in adaptive functioning.  <u>Id.</u> at 42.  Adaptive functioning refers to "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting."  <u>Id.</u>  In order for mental retardation to be diagnosed, there must be significant limitations in adaptive functioning in at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.  <u>Id.</u> at 41.

<u>Id.</u> at 1266 n.8.

We find that there was competent, substantial evidence for the circuit court to determine that Burns also failed to prove this prong.  First, the State presented evidence that Burns was always able to support himself.  Burns

- 35 -

co-owned a watermelon hauling company with his sister, for which, even according to Dr. Dee's testimony, Burns served at least as a crew leader and driver.  Burns also worked as a cab driver and on an assembly line.

As set forth in the discussion of the first issue in this opinion, much of the testimony presented at Burns' 1994 re-sentencing directly conflicts with the evidence presented in support of the mental retardation claim he now makes. Burns' mother and several of his seventeen brothers and sisters testified that Burns provided much financial support to the family after he graduated from high school.  Several witnesses described him as intelligent and smart, and noted that he emphasized to his younger siblings the importance of education. Finally, while his sister who ran a business with him . . . told Dr. Dee that Burns was only a driver for their company, at the re-sentencing she credited him with having the idea to start their business.  In fact, the first mitigating factor listed in our opinion on the appeal of the re-sentencing is: "Burns was one of seventeen children raised in a poor rural environment and consequently had few economic, educational, or social advantages, but despite these disadvantages, he is *intelligent* and became continuously employed after high school."  Burns II, 699 So. 2d at 648 (emphasis added).

Although Burns was discharged from the military and Dr. Dee testified that reports there labeled him as unintelligent, Dr. Gamache theorized that the poor reports Burns received were likely a result of a combination of depression, motivation, racism, and low intelligence.  He noted that Burns' records provided instances where Burns refused to follow orders, not that his intelligence prevented him from following orders.

We find that there was competent, substantial evidence to support the lower court's determination that Burns did not meet the adaptive behavior prong. The evidence shows that Burns maintained employment throughout his time before his arrest and was fully able to support himself. Also, Burns is able to communicate well and keeps himself well-groomed.  At the re-sentencing, his friends and family testified that he continued to be a leader in their family and stay in touch despite being in prison.  The evidence presented by the State and relied on by Dr. Gamache was competent and substantial, and we therefore find no error in the circuit court's determination that Burns failed to prove this second prong.

### 5. Onset Before Age Eighteen

There is competent, substantial evidence to support the circuit court's determination on the third prong as well.  Burns graduated from high school, never failing a grade, and earning good marks in self-care and behavior areas.  Although Burns argues that his passing grades were merely the effect of a silent policy of social promotion, we defer to the circuit court's

determination on this fact.  Although Burns provided evidence that a policy of
social promotion was in place, no evidence was presented that this policy was
specifically applied to Burns.  There was no evidence that Burns met the
statutory definition of mental retardation before the age of eighteen.

6. Conclusion

Thus, because the circuit court's determination that Burns failed to meet any
of the three prongs of the mental retardation definition is supported by
competent, substantial evidence, we affirm the circuit court's denial of Burns'
motion for a determination of mental retardation.

Burns III rules that Burns fails to meet Florida's definition of mental retardation.

Instead of prescribing the requirements for determining whether someone is

mentally retarded, each state is free to develop a procedure for determining whether

a person's mental deficits precludes imposing the death penalty.

To the extent there is serious disagreement about the execution of mentally
retarded offenders, it is in determining which offenders are in fact retarded.
In this case, for instance, the Commonwealth of Virginia disputes that Atkins
suffers from mental retardation.  Not all people who claim to be mentally
retarded will be so impaired as to fall within the range of mentally retarded
offenders about whom there is a national consensus.  As was our approach in
Ford v. Wainwright, 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986),
with regard to insanity, "we leave to the State[s] the task of developing
appropriate ways to enforce the constitutional restriction upon [their]
execution of sentences." Id., at 405, 416-417, 106 S. Ct. 2595.

Atkins, 530 U.S. at 317.  Rule 3.203(b), Florida Rules of Criminal Procedure,

requires proving (1) significant subaverage general intellectual functioning, (2)

deficits in adaptive behavior, and (3) manifestation before age eighteen.  In rejecting

the testimony of defense expert Dr. Dee and accepting the testimony of state expert

Dr. Gamache as more credible, the state court rejected finding that Burns has a

"significant subaverage general intellectual functioning."  The response (Doc. 26 at

80-81) correctly argues that the state court's finding of fact is reasonable because

Dr. Gamache's opinion considers the individual subtest scores, a scoring process

recommended by the <u>Diagnostic and Statistical Manual of Mental Disorders</u> at 40

(4th ed. 2000) ("DMV-IV"), which states as follows:

> When there is significant scatter in the subtest scores, the profile of strengths
> and weaknesses, rather than the mathematically derived full-scale IQ, will
> more accurately reflect the person's learning abilities.  When there is a
> marked discrepancy across verbal and performance scores, averaging to
> obtain a full-scale IQ score can be misleading.

Dr. Gamache opined that Burns had a subtest score as high as 92 and as low as 64.

This wide range of scores supports consideration of each of the subtest scores, as

DMV-IV recommends.  Consequently, the state court's finding that Burns fails to

show "significant subaverage general intellectual functioning" is reasonable.

The wealth of character evidence presented at the re-sentencing largely

eviscerates the assertion that Burns has a "deficit in adaptive behavior."  According

to the witnesses, after leaving the family home Burns lived a fairly normal,

productive life and supported himself.

> [T]he defense . . . presented over thirty witnesses at the re-sentencing, who
> were mainly family members and close friends of Burns.  They testified about
> the important role Burns played in their family.  Burns was described as a
> leader of the family, and many witnesses testified about the amount of
> support he provided to them.  For example, the defendant's mother, Ethel
> Burns, testified that after the defendant left his family home in Mississippi,
> he continued to send money home.  One family member described him as a
> role model.  One of his sisters stated that he was "smart, loving and caring."

<u>Burns III</u>, 944 So. 2d at 240.  The state court's finding that Burns fails to show a

"deficit in adaptive behavior" is reasonable.

Finally, although Burns presented to the state court some indication that Burns manifested signs of mental retardation during his childhood, the state court found that Burns failed to meet his burden of proving "manifestation before age 18." Burns presents no legal basis for rejecting the state court's findings.

The state court determined that Burns proved none of the three requirements to establish mental retardation.  Burns III reasonably determined the facts and reasonably applied Atkins.

## V.  SECOND POST-CONVICTION PROCEEDING

### Ground VI

> Florida's lethal injection method of execution violates the eighth amendment prohibition against cruel and unusual punishment and therefore Burns' sentence of death is unconstitutional.

Burns alleges that Florida's new "Lethal Injection Protocol," established in 2007 following the "botched" execution of Angel Diaz, still "creates an unnecessary risk of excessive pain and therefore violates the Eighth Amendment's command that 'cruel and unusual punishment [not be] inflicted.'"  Petition at 49 (Doc. 1).  Burns IV, 3 So. 3d 316 at *1 (brackets original), rejected this claim as follows:

> Burns' current appeal represents a broad attack on the constitutionality of Florida's lethal injection system and, to a lesser extent, the inability of post-conviction counsel to mount such attacks.  Specifically, Burns argues that:  (1) newly discovered evidence, namely the circumstances surrounding the execution of Angel Diaz and the August 2007 Department of Corrections lethal injection protocols, proves that execution by lethal injection violates the Eighth Amendment prohibition against cruel and unusual punishment . . . .

We . . . affirm the post-conviction court's summary denial of claim one.[8]  Under claim one, Burns asserts numerous alleged deficiencies in Florida's lethal injection protocols, including claims that the protocols fail to require that the execution team have appropriate training and credentials; fail to require adequate record-keeping and an adequate review and certification process; and fail to require a proper execution facility and method.  We rejected in <u>Lightbourne</u> several claims identical to those Burns now makes.  <u>See</u> <u>Lightbourne</u>, 969 So. 2d 326; <u>see also</u> <u>Tompkins v. State</u>, 994 So. 2d 1072 (Fla. 2008) (rejecting lethal injection claims and citing other lethal injection cases). We find that the remainder of Burns' claims that were not duplicated in <u>Lightbourne</u> were properly summarily denied under the analogous and comprehensive analysis we undertook in <u>Lightbourne</u>.  "A claim that the protocol can be improved and the potential risks of error reduced can always be made."  <u>Lightbourne</u>, 969 So. 2d at 351.  However, "this Court's role is not to micromanage the executive branch in fulfilling its own duties relating to executions."  <u>Id.</u>  Further, Burns' alleged deficiencies do not "overcome the presumption of deference [this Court] give[s] to the executive in fulfilling its obligations," <u>id.</u> at 352; they do not establish "cruelty inherent in the method of execution," <u>id.</u>; and they do not demonstrate "a substantial, foreseeable[,] or unnecessary risk of pain," <u>id.</u> at 353.  Accordingly, the circuit court properly summarily denied relief on these claims, and the order denying relief is hereby affirmed.

<u>Baze v. Rees</u>, 553 U.S. 35 (2008) (plurality), governs challenges to the constitutionality of using a three-drug protocol.  Burns's claim lacks merit because Florida's three-drug protocol is nearly identical to the protocol approved in <u>Baze</u>, 553 at 61.  "Florida's lethal-injection protocol is substantially similar to that of Kentucky.  This holding brings Florida's lethal-injection protocol squarely within the safe harbor created by the <u>Baze</u> plurality."  <u>Ventura v. Florida</u>, 2 So. 3d 194, 200 (Fla.), <u>cert.</u> <u>denied</u>, ___ U.S. ___, 129 S. Ct. 2839 (2009).  An Eighth Amendment challenge fails if a state's protocol is substantially the same as the protocol approved in <u>Baze</u>.

---

[8]  The other claims addressed in <u>Burns IV</u> are not alleged in the federal petition.

> Wellons attacks the constitutionality of Georgia's use of the three-drug
> protocol method of execution by lethal injection.  He argues that the
> three-drug protocol violates the Eighth Amendment's prohibition against
> cruel and unusual punishment and that the district court erred in denying an
> evidentiary hearing on his Eighth Amendment claim.  Both of these claims
> have been foreclosed by Baze v. Rees, [553] U.S. [35], 128 S. Ct. 1520, 170 L.
> Ed. 2d 420 (2008), in which the United States Supreme Court upheld a
> similar three-drug lethal injection protocol as not constituting cruel and
> unusual punishment under the Eighth Amendment.

Wellons v. Hall, 554 F.3d 923, 942 (11th Cir. 2009), vacated on other grounds ___,

U.S. ___, 130 S. Ct. 727 (2010).  See also, e.g., Raby v. Livingston, 600 F.3d 552, 560

(5th Cir. 2010) ("We hold that the Texas Execution Procedure, as written and as

administered, is within the safe harbor established by Baze."), Jackson v. Danberg,

594 F.3d 210, 230 (3rd Cir.) ("The safeguards drafted into Delaware's new lethal

injection protocol exceed those contained in the Kentucky protocol that seven

Justices in Baze found constitutionally firm . . . ."), cert. denied, ___ U.S. ___, 131

S. Ct. 458 (2010), and Emmett v. Johnson, 532 F.3d 291, 300 (4th Cir. 2008) ("[W]e

conclude that Virginia's protocol is substantially similar to Kentucky's protocol and

that Emmett has failed as a matter of law to demonstrate a substantial or

objectively intolerable risk that he will receive an inadequate dose of thiopental,

particularly in light of the training and safeguards implemented by Virginia prior to

and during the execution process.").

Burns's prospective execution is neither cruel nor unusual.  "Simply because

an execution method may result in pain, either by accident or as an inescapable

consequence of death, does not establish the sort of 'objectively intolerable risk of

harm' that qualifies as cruel and unusual." Baze, 553 U.S. at 50.  Likewise, Burns

Case 8:07-cv-01275-SDM-AEP   Document 31   Filed 08/10/11   Page 42 of 43 PageID 655

cannot base a claim on the possibility that execution personnel, whether due to

negligence or a lack of training, might improperly administer the first drug.  "Some

risk of pain is inherent in any method of execution—no matter how humane–if only

from the prospect of error in following the required procedure."  553 U.S. at 47.

Burns fails to show that the rejection of his Eighth Amendment claim in <u>Burns IV</u> is

an unreasonable application of <u>Baze</u>.

Accordingly, the petition for the writ of habeas corpus (Doc. 1) is **DENIED**.

The clerk shall enter a judgment against Burns and close this case.

## VI.  CERTIFICATE OF APPEALABILITY

Rule 11(a), Rules Governing Section 2254 Cases, requires a district court to

"issue or deny a certificate of appealability when it enters a final order adverse to

the applicant."  As stated in <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000):

> To obtain a COA under § 2254(c), a petitioner must make a substantial
> showing of the denial of a constitutional right, a demonstration that, under
> <u>Barefoot</u>, includes showing that reasonable jurists could debate whether (or,
> for that matter, agree that) the petition should have been resolved in a
> different manner or that the issues presented were "'adequate to deserve
> encouragement to proceed further.'"  <u>Barefoot</u>, <u>supra</u>, at 893, and n.4, 102
> S. Ct. 3383 ("sum[ming] up" the "substantial showing" standard).
>
> When the district court denies a habeas petition on procedural grounds
> without reaching the prisoner's underlying constitutional claim, a COA
> should issue when the prisoner shows, at least, that jurists of reason would
> find it debatable whether the petition states a valid claim of the denial of a
> constitutional right and that jurists of reason would find it debatable whether
> the district court was correct in its procedural ruling.  This construction gives
> meaning to Congress' requirement that a prisoner demonstrate substantial
> underlying constitutional claims and is in conformity with the meaning of the
> "substantial showing" standard provided in <u>Barefoot</u>, <u>supra</u>, at 893, and n.4,
> 102 S. Ct. 3383 . . . .

- 42 -

An applicant need not show probable success on appeal, but the issuance of a certificate of appealability entails more than "mere good faith" or only the "absence of frivolity." As stated in Miller-El v. Cockrell, 537 U.S. 322, 338 (2003):

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail. As we stated in Slack [v. McDaniel, 529 U.S. 473 (2000)], "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 529 U.S. at 484, 120 S. Ct. 1595.

Burns's petition for the writ of habeas corpus was denied on both procedural grounds and on the merits. Because jurists of reason would not fairly debate either (a) whether the petition states a valid claim of the denial of a constitutional right or (b) whether the district court was correct in the procedural ruling, a certificate of appealability is unwarranted.

Accordingly, a certificate of appealability is **DENIED**. Leave to proceed in forma pauperis on appeal is **DENIED**. Burns must pay the full $455 appellate filing fee without installments unless the circuit court allows Burns to proceed in forma pauperis.

ORDERED in Tampa, Florida, on _August 10th_, 2011.

_____
Steven D. Merryday
UNITED STATES DISTRICT JUDGE

- 43 -